**In re Joseph Robert COPPOCK, Debtor.**

**VALLEY FIDELITY BANK AND TRUST COMPANY, Plaintiff,**

v.

**Joseph Robert COPPOCK, Defendant.**

**Bankruptcy No. 3–85–00648.**
**Adv. Proc. No. 3–85–1059.**

United States Bankruptcy Court,
E.D. Tennessee.

Feb. 25, 1986.

Ambrose, Wilson & Grimm, Scott R. Fransen, Knoxville, Tenn., for plaintiff.

Robert L. Cheek & Jess D. Campbell and Associates, Jess D. Campbell, Knoxville, Tenn., for defendant.

## MEMORANDUM

CLIVE W. BARE, Bankruptcy Judge.

Plaintiff seeks a determination of nondischargeability of a debt in the amount of $10,406.95, alleging that the debtor obtained a loan by false pretenses, a false representation, or actual fraud. 11 U.S.C. § 523(a)(2)(A) (West Supp.1985). Trial was held October 30–31, 1985.

## I

In 1982, for a short period of time, Ralph Tallent and the debtor, Robert Coppock, were engaged in buying and reselling used automobiles. On July 9, 1982, Tallent and Coppock visited a branch office of the Valley Fidelity Bank and Trust Company (Bank) for the purpose of obtaining a loan on a new vehicle, a 1982 Pontiac Grand Prix. The automobile had purportedly been purchased by Tallent. He also had purportedly written a check for the purchase price and needed financing to cover the check. It was initially contemplated that Tallent would obtain the loan and that Coppock would co-sign. However, because Tallent did not have earned income at the time or any prior dealings with the Bank, the parties agreed that Coppock would be the maker and Tallent the co-maker.[1] A loan application was thereupon prepared and signed by Coppock. On July 13, 1982, a manufacturer's statement of origin reflecting the transfer of a 1982 Pontiac Grand Prix, Serial No. 1G2AP3743CP626291, from General Motors to Rogan Pontiac, 311 Main Street, Rogersville, Tennessee, with a first assignment to Ralph Tallent dated July 8, 1982, and a second assignment to Bob Coppock dated July 12, 1982, (both assignments are on the reverse side) was presented to the Bank officer, along with a purported bill of sale dated July 12, 1982, from Rogan Pontiac to Bob Coppock. The bill of sale was purportedly acknowledged before Ralph Allen, a notary public. Relying upon the documents presented, a Bank officer's verification of the information in the documents by phoning a number provided by Coppock and Tallent, and Coppock's prior dealings with the Bank, the Bank approved the loan. Coppock and Tallent executed a note and security agreement listing the automobile as collateral. The Bank issued a check to Coppock in the amount of $9,250.00. A certificate of title was thereafter issued by

---

1. Tallent's loan application with the Bank reflects monthly disability income of $1,500.80

and rental income in an unspecified amount.

the Department of Revenue to Bob Coppock, with the Bank's lien noted thereon.

Arrangements also were made whereby Tallent's Social Security disability check would be deposited at the Bank with the monthly payment on the car loan to be deducted therefrom. This arrangement apparently did not materialize or was discontinued after only one payment was made and, when the loan became delinquent, the Bank unsuccessfully attempted to locate and repossess the automobile. At this point the Bank learned that no Pontiac Grand Prix with the vehicle identification number shown on the various documents had been manufactured. Although the Bank officer had seen a 1982 Pontiac Grand Prix at the time the loan was made, she had not verified the serial number on the vehicle.

Both the manufacturer's statement of origin and the bill of sale are fraudulent. The statement of origin is a forged form. Although the bill of sale, dated July 12, 1982, identifies Rogan Pontiac as the seller and Ralph Allen as the salesman, Wanda Vaughan, an employee of Railey-Vaughan Motor Company, testified that she, her husband, and her father acquired the Pontiac dealership in Rogersville, Tennessee, from Rogan Pontiac in July or August 1980, that Rogan Pontiac was not in business in May 1982, and that she knew no person by the name of Ralph Allen.[2]

Patrick Wade, a special agent with the National Automobile Theft Bureau, and a former criminal investigator with the Knoxville Police Department, testified that the manufacturer's statement of origin presented to the Bank was a forged document, that no automobile with the designated serial number was ever produced by General Motors. Wade testified:

There was no vehicle with the serial number ever produced. There was a vehicle produced that had the same nine characters, which are essential for us to do our work, and which is how our computer is set up. It was a Bonneville that was shipped to South Carolina and is currently registered to a man—or, couple in South Carolina.[3]

At some point in time, both Coppock and Tallent became the subject of a police investigation. As the result of searches of their separate apartments, a number of items—according to the Bank, "tools of the trade"—were seized: spurious manufacturers statements of origin, (both apartments), showing General Motors Corporation, Chrysler Motor Corporation and Ford Motor Company; blank bills of sale (both apartments); rubberized stamps with the names of the three automobile manufacturing companies (both apartments); a notary public seal with the name "ED POE" embossed thereon (Coppock's apartment);[4] three notary public seals, one with "RALPH ALLEN" embossed thereon (Tallent's apartment); and N.A.D.A. Official Used Car Buyers Guides (both apartments).

The "RALPH ALLEN" notary seal was introduced into evidence. Wade testified that this seal originally had been embossed with the name "RALPH TALLENT" but that it had been altered to read "RALPH ALLEN."[5] The alteration was effected by filing down the first and last letters of "TALLENT."

Coppock's explanation for the "tools of trade" found in his apartment is that they were brought there by Tallent, who requested that he keep them for him.

They were in a brown paper bag in my safe in my bedroom. Mr. Tallent brought them over and asked if he could leave them in my safe because he had

---

**2.** As heretofore noted, Ralph Allen's name and seal appear as both the "Salesman" of Rogan Pontiac and the "Notary Public" in the bill of sale from Rogan Pontiac to Bob Coppock. His name also appears as the "Salesman" in the two assignments on the reverse side of the manufacturer's statement of origin.

**3.** Transcript of Proceedings at 63.

**4.** Wade testified that this seal had been used in other automobile fraud schemes.

**5.** The two other seals found in Tallent's apartment had the names "Ralph Tallent" and "Ralph P. Tallent" embossed thereon.

someone living with him that he didn't trust, and he wanted to lock them up. And I told him I'd unlock the safe, and told him to put them in there.[6]

Coppock denies that he ever examined the contents of the bag.

As to the missing "non-existent" Pontiac, Coppock testified he did not know its whereabouts, but that Tallent told him he had loaned it to a friend to go to Florida.[7]

## II

Section 523 of Title 11 of the United States Code enacts in material part:

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

.        .        .        .        .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. . . .

11 U.S.C.A. § 523(a)(2)(A) (West Supp. 1985).

To sustain an objection to dischargeability under § 523(a)(2)(A) a creditor must prove that:

(1) the debtor knowingly made a materially false representation;

(2) the debtor made the false representation with the intention to deceive the creditor;

(3) the creditor reasonably relied upon the debtor's materially false representation; and

(4) the creditor sustained a loss proximately resulting from the debtor's materially false representation.[8]

The proof clearly establishes that Coppock's warranty of ownership in the securi-ty agreement he gave to the Bank is materially false. The Bank's reliance upon the false representation of ownership of the 1982 Grand Prix was reasonable. Further, the Bank's loss in this matter is a proximate result of Coppock's materially false representation. The decisive issue is whether Coppock knowingly made the false representation of ownership with intent to deceive the Bank.

Denying any intent to deceive or defraud the Bank, Coppock maintains he was merely doing a favor for Tallent, considered to be a friend at the time of the loan. According to Coppock he too is a victim of Tallent's fraud.

Martha Swain Wallen, the Bank officer who made the loan, testified:

Mr. Coppock and Mr. Tallent came into my office to apply for the loan. Before any applications were completed they told me the situation of what they wanted to do. Mr. Tallen [sic] had purchased an automobile for which he had written a check, and he wanted to—*the two of them wanted to borrow some money.* At no time did I ever see Mr. Tallent by himself.

.        .        .        .        .

When the loan was approved, I told Mr. Coppock at that time that if we were going to use the Pontiac as collateral for the loan, that I would have to have papers in order to apply for certificate of title in order to note our lien.

He indicated to me at that time that the papers were issued to Mr. Tallent, but that *the two of them would go back to the dealership* and have the MSO [manufacturer's statement of origin] switched over to Mr. Coppock's name.

.        .        .        .        .

Q. And who was it that provided this documentation to you? Did they come

---

**6.** Transcript of Proceedings at 85.

**7.** Tallent did not testify in this proceeding. He is apparently in jail, facing charges of receiving stolen property, specifically automobiles. Charges are also pending against Coppock.

**8.** See *McLemore v. Simpson County Bank (In re Krulik),* 6 B.R. 443, 448 (Bankr.M.D.Tenn.1980).

in and bring it together, or did one of them present it?

A. I never saw Mr. Tallent by himself prior to the completion of the loan.

Q. So, this documentation you told them you had to have was brought to you by them?

A. That is correct. And it was my understanding at that time that Mr. Coppock accompanied Mr. Tallent to the dealership. That is what *they intimated to me*, was *that the two of them had it changed*.[9]

Wallen further testified that she "called the number that they [Coppock and Tallent] had given [her] to verify that the transfer of the MSO [manufacturer's statement of origin] had been done."[10] Wallen does not recall if either Coppock or Tallent told her the name of the dealer from whom the 1982 Grand Prix was purportedly purchased. In any event, she does not remember the represented identity of the person she called to verify the transfer to Coppock.

Coppock insists that at the time of the loan he did not even know what a manufacturer's statement of origin was. He also insists Tallent took care of all the paperwork himself and that he never accompanied Tallent to a dealership. Undoubtedly he did not accompany Tallent to a dealership to acquire the 1982 Grand Prix.

When asked the identity of the seller of the 1982 Grand Prix, Coppock answered, "I have no idea."[11] The court cannot believe that Coppock would not have asked Tallent where he had purchased the 1982 Grand Prix. It is a natural question. Indeed it is a critical question for a person receiving an assignment of title, as Coppock did from Tallent.[12]

Coppock's explanation for his possession of the "ED POE" notary seal and the forged manufacturers statements of origin also is not credible. In the first instance, why would Tallent deliver these items to Coppock for safekeeping yet apparently retain similar items at his own apartment?[13] More importantly, Coppock's testimony that he agreed to store a brown paper bag and its contents in his safe for Tallent without inquiring about the contents of the bag is not credible.[14]

In discussing the intent necessary to support a determination of nondischargeability, Judge Paskay has stated:

[W]hile fraud is never presumed and evidence showing the possibility of fraud or showing circumstances which might create a suspicion of fraud are not sufficient ... the fraud may be found to exist, even in the absence of direct proof, which of course, is rarely available. If the totality of the circumstances present a picture of deceptive conduct by the borrower, which indicates that the borrower intended to deceive and cheat the lender, the intended falsehood, coupled with this conduct, is sufficient to establish the requisite intent required under the Act.

*Century Bank v. Clark*, 1 B.R. 614, 617 (Bankr.M.D.Fla.1979).

---

9. Transcript of Proceedings at 36, 37 and 39 (emphasis added).

10. Transcript of Proceedings at 38.

11. Transcript of Proceedings at 14.

12. Coppock is not an unsophisticated person insofar as purchasing automobiles. He testified that he met Tallent at an auto auction and that they bought and resold automobiles through the auction.

13. The dates the respective apartments of Coppock and Tallent were searched is not a matter of record.

14. The court also finds that Coppock's testimony about his interest in the 1982 Grand Prix was evasive. When asked if he had an interest in the 1982 Grand Prix, Coppock answered: "What I was actually doing is doing a favor for someone that I considered a friend of mine at the time." Transcript of Proceedings at 25. He further testified:

Q. You did warrant to the bank on your security agreement that you had an interest or title to the car and that you could give title to that car, didn't you?
A. Yes, sir.
Q. But you didn't have it, did you?
A. I saw a car. There was a car in existence. I rode down to the bank in the car.

Transcript of Proceedings at 86–87.

The totality of the circumstances in this proceeding presents a picture of deceptive conduct by Coppock. It is the conclusion of the court that he knowingly misrepresented he had ownership rights to the 1982 Grand Prix with the intent to deceive the Bank. Accordingly, pursuant to § 523(a)(2)(A) Coppock's debt to the Bank is nondischargeable.

This Memorandum constitutes findings of fact and conclusions of law, Bankruptcy Rule 7052.